IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| United States of America, | Case No.: 24-cr-50023 |
| v. | |
| Wesley R. Smith | Judge Iain D. Johnston |

MEMORANDUM OPINION AND ORDER

Officers discovered a gun on Defendant Wesley Smith when they executed a search warrant at his girlfriend's residence. Smith moves to suppress the gun along with incriminating statements he made later. For the reasons below, the Court denies Smith's Motion.[1]

**Background**

On May 1, 2024, Winnebago County Sheriff's Deputy Benjamin Valdivieso sought a warrant to search a home at 3203 Hanover Drive in Rockford, Illinois. Dkt. 26-2. In his supporting affidavit, Deputy Valdivieso testified to the following:

In April 2024, Valdivieso spoke with a cooperating witness ("CW"). *Id.* This CW had "provided truthful and accurate information to law enforcement in the past." *Id.* at 4–5. He provided information to Valdivieso for "consideration of pending criminal charges." *Id.* at 5. He also had a criminal history and wished to remain anonymous for fear of retaliation. *Id.*

---

[1] The Government didn't request a hearing, and the Court agrees with Smith that one isn't necessary. Dkt. 37 at 15.

1

The CW informed Valdivieso about an individual known as "Roni." *Id.* at 4. Valdivieso determined that "Roni" was "Matthew Ronan," who had prior interactions with Valdivieso. *Id.* The CW further noted that Roni was often found with "Hispanic individuals who carry firearms and possess controlled substances." *Id.* Roni's criminal history includes arrests for aggravated discharge of a firearm, reckless discharge of a firearm, aggravated battery, domestic battery, and possession of a controlled substance. *Id.*

According to the CW, Roni sold crystal meth in the Winnebago County area. *Id.* The CW offered to contact Roni and, under law enforcement direction, arrange a "controlled buy" at 3203 Hanover Drive in Rockford, Illinois (the "Residence"). *Id.*

Valdivieso discovered recent police reports tied to that address. *Id.* The then-most recent report involved a "Suzette Vazquez." Specifically, on April 24, 2024, roughly a week before the search warrant request, Vazquez and her boyfriend, Defendant Wesley Smith, had a domestic battery incident. *Id.* Vazquez was also a member of the "Satan's Disciples" gang and had a lengthy criminal history. *Id.* According to Vazquez, Smith was at the Residence "off and on" and that he "comes and goes." Dkt. 33 at 4 (citing dkt. 26-4 at 33:00–34:00).

Within 72 hours of requesting the search warrant, the Sheriff's Narcotics Unit (the "Unit") made a controlled purchase of crystal meth outside the Residence. Dkt. 26-2 at 5. That operation occurred as follows: the Unit met the CW at a predetermined location and searched his car, finding it free of drugs or money. *Id.* The Unit then gave the CW cash and instructed him to purchase meth from Roni at

2

the Residence. *Id.* Valdivieso then followed the CW from the predetermined location to the Residence, observing him park outside. *Id.* Two other officers then observed Roni walk out of the front door of the Residence and wait for the CW. *Id.* Those officers saw Roni walk to the CW's car, get into the passenger's seat for a few moments, and exit. *Id.* Roni then walked back into the Residence. *Id.*

The CW, under Valdivieso's continued surveillance, then drove back to the predetermined location. *Id.* The CW gave the officers a substance suspected to be crystal meth, which he said he received from Roni. *Id.* The officers "field tested" the substance and it tested "positive for the probable presence of methamphetamine." *Id.*

On May 1, 2024, based on Valdivieso's sworn testimony, a Winnebago County Circuit Court judge found probable cause to search the Residence for meth and related items. *Id.* at 2. The warrant only authorized a search of the residence, not any individual occupant. *Id.*

On May 2, 2024, the Unit executed the search warrant. Dkt. 26 at 4. Immediately upon entering through the front door, officers observed Defendant Smith (the front door opens into a living room). Dkt. 26-3 at 1:00–1:50. Smith complied with commands to get on the ground. *Id.* Officers then asked Smith if he had any contraband on him, and Smith said he didn't. *Id.* Officers patted-down Smith's body, ultimately discovering a loaded Glock. *Id.* They discovered Smith had an active arrest warrant. Dkt. 26 at 4. He was taken into custody for the firearm possession as well as the outstanding warrant. *Id.* He later made incriminating statements at the police station. *Id.*

3

**Analysis**

The Court addresses the following legal issues: (1) whether Smith has standing to contest the search warrant; (2) whether a judge had probable cause to issue the search warrant; (3) if not, whether the officers may rely on the good faith reliance on a warrant exception; (4) whether the officers lawfully "patted-down" or "frisked" Smith; and (5) whether the inevitable discovery doctrine applies in this case.

*1) Standing*

The Government contends that Smith lacks Fourth Amendment standing to contest the residential search warrant. Dkt. 33 at 3. As the Motion's proponent, Smith bears the burden of establishing standing. *U.S. v. Randle*, 966 F.2d 1209, 1212–13 (7th Cir. 1992) (citing *Rakas v. Illinois*, 439 U.S. 128, 132 n.1 (1978)). A proponent must show a legitimate expectation of privacy in a particular area to contest a search of it. Smith argues that he was an "overnight guest" under *Minnesota v. Olson*, 495 U.S. 91 (1990), and therefore had a "legitimate expectation of privacy" in the Residence. The Government says Smith is more like the proponents in *Minnesota v. Carter*, 525 U.S. 83 (1998), who lacked standing because they had no such privacy expectation.

The proponents in *Carter* came to an apartment "for the sole purpose of packaging cocaine." *Id*. at 86. They "had never been to the apartment before and were only in the apartment for approximately 2½ hours." *Id*. In contrast, Smith's girlfriend, Suzette Vasquez, lived at the Residence and Smith would "come and go." Vasquez also told police that Smith was at the Residence the night before the search.

4

The Government notes that Vasquez didn't explicitly say he spent the night. But, in Reply, Smith submitted an affadavit from Vasquez, affirming that Smith stayed at the Residence the night before the incident and that "[h]e stayed overnight almost every night." Dkt. 37-1. Regardless, the Government doesn't cite a case *requiring* a prior-night sleepover. It's a close call, but as Vasquez's boyfriend, who spent considerable time at the Residence, Smith had a sufficient privacy interest in it. So, Smith has standing to challenge the search warrant.

2) *Probable Cause*

Smith argues that law enforcement lacked probable cause to search the Residence. Probable cause exists where there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238; *U.S. v. Sanchez-Jara*, 889 F.3d 418, 421 (7th Cir. 2018). A court's finding of probable cause "carries a strong presumption of correctness." *See Sanchez-Jara*, 889 F.3d at 421.[2]

In this case, officers spoke with a CW about a likely drug dealer named Roni. Days before they searched the Residence, officers organized a controlled buy, adhering to careful procedures to ensure they could trace any evidence directly back to Roni. The officers at all times observed the CW and personally witnessed Roni exit the Residence, enter the CW's car, and reenter the Residence. Roni had an extensive

---

[2] Quoting *Sanchez-Jara*, the Government asserts that "[a] *state court judge's* finding of probable cause 'carries a strong presumption of correctness.'" Dkt. 33 at 4 (emphasis added). *Sanchez-Jara* involved a federal district judge—not a state judge—finding probable cause. 889 F.3d at 420 ("The warrant, issued by a federal district judge . . . ."). Nevertheless, the Court extends that same presumption to its judicial colleagues on the state bench.

criminal record and was known to associate with individuals who possessed drugs and weapons. These facts certainly establish a "fair probability that contraband or evidence of a crime" would be found at the Residence. So, the Unit had probable cause to search it.

Smith disagrees. He argues that because Valdivieso relied on a confidential informant's tip, the probable cause determination turns on the informant's credibility. *See* dkt. 26 at 6 (citing *U.S. v. Olson*, 408 F.3d 366, 370 (7th Cir. 2005). Relevant factors include whether the informant had firsthand knowledge, provided sufficient details, relayed subsequently corroborated information, or testified at a probable cause hearing. *Id.*; *U.S. v. Haynes*, 882 F.3d 662, 665 (7th Cir. 2018). Based primarily on the CW's failure to testify and cases without police corroboration, Smith says these factors require suppression.

But the Government has the better argument. In this case, the officers corroborated the CW's information, personally observing the drug transaction and witnessing the dealer reenter the Residence. As the Government argues, these facts are nearly identical to those in *Haynes*. Like this case, the officers in *Haynes* received information from a confidential informant, asked him to participate in a controlled buy, and surveilled the location. 882 F.3d at 664. Further, the *Haynes* informant also didn't testify at the probable cause hearing. *Id.* The Seventh Circuit held that the *Haynes* informant was reliable, because "[m]ost significantly, the deputies corroborated the story with their own investigation, by conducting surveillance and executing a controlled buy." *Id.* at 665. So too in this case.

6

Smith construes *Haynes* and other cases to require officers to observe "multiple buys." *See* dkt. 37 at 4–6 (noting that the *Haynes* officers "periodically" surveilled the house "several times"). Those cases make no such demand, and for good reason: "[P]robable cause involves the exercise of judgment, which turns on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Stokes v. Bd. of Ed. of the City of Chicago*, 599 F.3d 617 (7th Cir. 2010) (citing *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993) (cleaned up). Nor does the Court find Smith's citation to a Sixth Circuit decision at all persuasive. True, that court found insufficient probable cause where the officers observed a controlled buy only once. 443 F.3d 480 (6th Cir. 2006). But Smith ignores the "more important" part, that "the affidavit offers no clue as to when this single controlled buy took place. *Id.* at 486. "Because probable cause has a durational aspect," the Sixth Circuit explained, at least some temporal reference point is necessary to ascertain its existence." *Id.* As explained in the next paragraph, the affidavit in this case *had* such a reference point, so *Hython*'s inapposite.

Smith still objects to that existent temporal reference point between the controlled buy and the affidavit. Citing *U.S. v. Edmond*, 15c3566, 2017 U.S. Dist. LEXIS (N.D. Ill. July 14, 2017), *aff'd*, 899 F.3d 446 (7th Cir. 2018), he argues that the affidavit lacked a "temporal reference point," because it "did not include the date on which the single controlled buy occurred." Dkt. 26 at 7. But Smith's wrong, because this affidavit *contained* a temporal reference point. As the Government notes, the controlled buy happened within seventy-two hours of the warrant application, which

7

Valdivieso submitted on May 1, 2024. So, it "occurred on April 28, 29, or 30." Dkt. 33 at 7. The Seventh Circuit has affirmed probable cause determinations involving such windows. *See id.* (collecting cases).

Finally, Smith argues that the officers lacked probable cause because they didn't see drugs *inside* the home. But Smith doesn't cite a case requiring such an observation, and the Government points to Seventh Circuit cases showing the opposite. In this case, officers observed Roni exit the Residence, likely give the CW meth, and reenter the Residence. The officers had probable cause to believe more contraband existed within that Residence.

### 3. *Good Faith Reliance on Warrant Exception*

Ordinarily, evidence obtained without probable cause should be suppressed. However, the good faith exception makes such evidence admissible "if the officer who conducted the search reasonably relied on a warrant." *U.S. v. Matthews*, 12 F.4th 647, 652 (7th Cir. 2021). "An officer's decision to obtain a warrant is prima facie evidence of his good faith." *Id.* (citations omitted). So, it's defendant's "heavy" burden to rebut that presumption. *Id.* Under these circumstances—involving a credible informant, direct and recent surveillance—even if the judge wrongly concluded probable cause existed, it was more than reasonable to rely on that warrant. So, because Smith fails to meet his burden, the Court concludes that the officers acted in good faith reliance on the warrant.

8

### 4. *Pat Down/Frisk*

Smith argues that the Unit acted unconstitutionally when they "frisked" him without reasonable suspicion. Dkt. 26 at 13. The Government refers to that inspection as a "pat down." Dkt. 33 at 10. To the extent there's a meaningful difference, the Court adopts Smith's terminology. The Government appears to concede that the officers frisked Smith without individualized probable cause or reasonable suspicion. *See id.* at 10–14; *see also* dkt. 37 at 1 (Smith asserting that the Government waived that argument). It nevertheless maintains that the officers acted lawfully because, under the circumstances, they could categorically frisk the individuals in the Residence. *Id.* at 14.

The Fourth Amendment requires searches and seizures to be reasonable, *Illinois v. McArthur*, 531 U.S. 326, 330 (2001). Ordinarily, an officer's "pat down" or "*Terry* frisk" is only constitutional when supported by reasonable, articulable suspicion. *U.S. v. Richmond*, 924 F.3d 404 (7th Cir. 2019). And, at least in a public tavern, that suspicion must be particularized to the frisked individual, "even though that person happens to be on premises where an authorized narcotics search is taking place." *Ybarra v. Illinois*, 444 U.S. 85, 94 (1979).

At the same time, however, the Fourth Amendment "authorizes officers executing a search warrant to 'take reasonable action to secure the premises and to ensure the own safety and the efficacy of the search.'" *U.S. v. Jennings*, 544 F.3d 815, 818 (7th Cir. 2008) (citations omitted). "Accordingly, officers executing a search warrant have categorical authority to *detain* any occupant of the subject premises

9

during the search." *Id.* (citing *Michigan v. Summers,* 452 U.S. 692, 705 (1981)) (emphasis added). "This authority exists in part because the probable cause underlying a warrant to search a premises gives police reason to suspect that its occupants are involved in criminal activity, and also because the officers have a legitimate interest in minimizing the risk of violence that may erupt when an occupant realizes that a search is underway." *Jennings*, 544 F.3d at 818.

So, when executing a residential search warrant, *Summers/Jennings* authorize officers to categorically *stop* all occupants. *Ybarrra*, on the other hand, bars officers from indiscriminately *frisking* all patrons in a search-warranted tavern. So, as the Government concedes, there's an open question: May officers executing a search warrant of a residence known to be associated with drugs frisk all occupants without particularized, reasonable suspicion? In other words, which case controls the residential context, *Summers/Jennings* or *Ybarra*?

This Court agrees with Judge Dow that "it is every bit as much a 'logical extension'" of *Summers* "to permit a pat-down frisk as it is to permit a brief detention of individuals who enter the 'security perimeter' of an ongoing narcotics search." *U.S. v. Banks*, 628 F. Supp. 2d 811, 817 (N.D. Ill. 2009). As the *Summers* Court explained, officers have an important "interest in minimizing the risk of harm" to themselves. 452 U.S. at 702. That's particularly true in executing a warrant for narcotics, which "is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." *Id.* Officers "minimize[]" the risk of harm to both police and occupants if the officers "routinely exercise unquestioned command of the

10

situation." *Id.* at 703. *See also* WAYNE R. LAFAVE, 2 SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 4.9(c) (2024) ("In weighing the need for a frisk incident to a execution of a search warrant, it is appropriate to take account of the increased likelihood of danger to the officer *if* in fact the person is armed," because the officer will be in close proximity for a longer period of time and distracted by the the search itself.) (citations omitted).

The officers in *Ybarra* indiscriminately frisked nine patrons in a public bar. *See* WAYNE R. LAFAVE, 2 SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 4.9(C) (2024) (LaFave describes *Ybarra* as "an easy case" in part because the "premises were a public place then open for business." "[I]t is fair to say" LaFave contends, that a warrant for a private premises would require a "somewhat different assessment."). In this case, the officers entered a small, unfamiliar, private residence at which officers, mere days earlier, personally witnessed an occupant sell meth. That same individual had a lengthy criminal record and was known to associate with armed people. "It would be inconsistent with [*Summers*] to forbid" those officers to perform a 'pat down' frisk on Smith and the other occupants when they executed the search warrant for drugs. *Banks*, 628 F. Supp. 2d at 817. As Judge Dow explained, "the correlation between drug trafficking and drugs is well established and requires vigilance on the parts of officers performing their duties." *Id.*

Under these circumstances, the officers acted objectively reasonably. And because they acted reasonably—as understood in *Summers/Jennings*—their actions were necessarily constitutional. *See Ohio v. Robinette*, 519 U.S. 33, 34 (1996) ("The

11

[Fourth] Amendment's touchstone is reasonableness, which is measured in objective terms by examining the totality of the circumstances."). The officers may not have had a "particularized reasonable suspicion" as those terms are used in police interactions with individuals in public areas, cars, or taverns. But, in executing a narcotics search warrant under these circumstances, *Summers/Jennings* teach that they effectively had such suspicion.[3] *See* LAFAVE, 2 SEARCH & SEIZURE § 4.9(d) ("[B]ecause it 'is generally known by the police and others that those who traffic in large quantities of narcotics are often armed,' the 'mere presence of a person or persons in such an environment, presents that reasonable suspicion and belief, which gives rise to sufficient and legal justification to frisk all present for weapons.'"). So, the Court holds that the frisk was constitutional and it therefore won't suppress the discovered Glock.

### 5. *Remaining Arguments*

The Government also argues that the Court should deny Smith's Motion based on the inevitable discovery doctrine. Law enforcement, the Government asserts, would have spoken with all the Residence's occupants, eventually discovering that Smith had an outstanding arrest warrant, in turn permitting a frisk. Because the Court holds that the underlying warrant and frisk were constitutional, it won't consider whether the inevitable discovery doctrine applies in this case.

---

[3] Smith also relies on the Fifth Circuit's decision in *U.S. v. Harvey*, 897 F.2d 1300, 1305 fn. 2 (5th Cir. 1990). That court ultimately found reasonable suspicion but conceded, consistent with *Ybarra*, that the "mere presence of an individual on [] premises [subject to a narcotics warrant] *with nothing more*" does not justify a frisk. *Id.* (emphasis added). So, the Court must still consider whether other additional factors make the frisk reasonable.

12

Finally, because Smith contends that the search was unconstitutional, he says the later statements are fruit of the poisonous tree. As explained, the Court rejects that premise and therefore finds the statements admissible.

**Conclusion**

For the above reasons, the Court denies Smith's motion to suppress.

Entered: April 30, 2025            By:_____
                                                                  Iain D. Johnston
                                                                  U.S. District Judge